**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**Fort Worth Division**

| | |
|---|---|
| EVEXIAS MEDICAL CENTERS, PLLC; EVEXIAS HEALTH SOLUTIONS, LLC; and NORTH AMERICAN CUSTOM LABORATORIES, LLC, D/B/A FARMAKEIO CUSTOM COMPOUNDING,<br><br>920 South Kimball Ave., Suite 140, Southlake, Texas 76092<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES FOOD AND DRUG ADMINISTRATION; and DR. ROBERT M. CALIFF, in his official capacity as Commissioner of Food and Drugs,<br><br>10903 New Hampshire Ave., Silver Spring, Maryland 20903<br><br>Defendants. | Civil Action No. _____ |

**COMPLAINT**

Plaintiffs EVEXIAS Medical Centers, PLLC, EVEXIAS Health Solutions, LLC, and North American Custom Laboratories, LLC, doing business as FarmaKeio Custom Compounding, by and through undersigned counsel, allege as follows:

**Nature of the Action**

1.      When patients have medical needs that cannot be satisfied by commercially-manufactured drugs, their doctors and pharmacists often turn to "compounded" medicines. Compounding involves a doctor or pharmacist combining, mixing, or altering ingredients to create a customized medicine tailored to each patient's individual needs—for example, removing an allergen from a commercially-manufactured drug or lowering the dosage of a drug for pediatric patients. Compounding is a traditional pharmaceutical practice that is as old as the practice of

medicine itself. *See* John F. Marriott, *et al.*, *Pharmaceutical Compounding & Dispensing* 4 (2d ed. 2010).

2.      In 1997, Congress sought to clarify the status of compounding under the Federal Food, Drug, and Cosmetic Act ("FD&C Act"). Congress took this action following the Food and Drug Administration's ("FDA") 1992 announcement—over fifty years after the FD&C Act was passed—that it now took the position that compounded medicines were "drugs" subject to the Act's requirements. Subjecting compounded medicines to the FD&C Act's requirements, like FDA approval, would effectively prohibit them, because satisfying such requirements is impossible given the individualized nature of the medicines. In the Food and Drug Administration Modernization Act of 1997, Congress added Section 503A to the FD&C Act, which provided that compounded medicines generally were not subject to the FD&C Act's approval and other key provisions provided that the medicines met certain requirements. *See* 21 U.S.C. § 353a.

3.      One of those requirements was that, if the compounded medicine was made using certain bulk drug substances, the bulk drug substance appear on a list of substances that may be used for compounding created by the FDA and adopted by regulation pursuant to notice and comment rulemaking. This list is called the "Section 503A Bulks List." Congress intended the FDA to create this list within a year, given that the entire purpose of Section 503A is to ensure continued patient access to critical compounded medicines.

4.      In 2013, Congress passed the Compounding Quality Act, which reiterated the FDA's duty to create the Section 503A Bulks List by notice and comment rulemaking.

5.      The FDA has never finalized the Section 503A Bulks List. Nearly three decades after the passage of the Food and Drug Administration Modernization Act of 1997 and one decade after the passage of the Compounding Quality Act, the FDA is still "working" on the list. *Bulk Drug Substances Used in Compounding* (last updated Dec. 21, 2022).[1]

---

[1]      *Available at* https://www.fda.gov/drugs/human-drug-compounding/bulk-drug-substances-used-compounding.

6.      According to the FDA, the agency's dereliction of its statutory duty to create the Section 503A Bulks List is no problem. This is so because the FDA has adopted an "interim" policy under which, without notice and comment, it assigns bulk drug substances nominated for inclusion on the Section 503A Bulks List to one of three categories as a matter of its "enforcement discretion." Effectively, Category 1 means permissible to compound, Category 2 means banned, and Category 3 means try again with more information. This "interim" policy is great for the FDA, which gets to regulate compounding based on the agency's whim and without the pesky requirement of notice and comment rulemaking. It is not so great for providers and patients, who have no notice of or input in this process.

7.      Plaintiffs are physicians and pharmacists who prescribe and make compounded medicines that were recently banned by the FDA pursuant to this "interim" policy that has been in place for years and has no end in sight. These banned medicines include therapies important for treating conditions like Turner Syndrome, Prader-Willi syndrome, HIV-associated lipodystrophy, wasting syndrome, osteoarthritis, osteoporosis, obesity, children born small for their gestational age or with idiopathic short stature, sepsis, Chronic Obstructive Pulmonary Disorder, and postoperative ileus, many of which cannot be effectively or safely treated with commercially-manufactured drugs. For each banned medicine, the FDA offered only two to four boilerplate sentences explaining its decision—many of which contained assertions that are directly contradicted by the administrative record.

8.      Three decades of the FDA regulating the compounding industry by bureaucratic diktat is enough. Plaintiffs accordingly bring this suit pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 551, *et seq.* ("APA").

## Parties

9.      Plaintiff EVEXIAS Medical Centers, PLLC, is a Texas professional limited liability company headquartered in Southlake, Texas.

10.      Plaintiff EVEXIAS Health Solutions, LLC, is a Texas limited liability company headquartered in Southlake, Texas.

11.     Plaintiff North American Custom Laboratories, LLC, doing business as FarmaKeio Custom Compounding ("FarmaKeio"), is a Texas limited liability company headquartered in Southlake, Texas.

12.     Defendant FDA is a federal agency of the United States Government headquartered in Silver Spring, Maryland.

13.     Defendant Dr. Robert M. Califf is the Commissioner of Food and Drugs.

## Jurisdiction and Venue

14.     This Court has jurisdiction over plaintiffs' APA causes of action under 28 U.S.C. § 1331. Through the APA, the United States has waived sovereign immunity from this lawsuit. *See* 5 U.S.C. § 702.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because plaintiffs reside in this district and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## Factual and Legal Background

### American Pharmacists' Long History of Compounding

16.     Pharmaceutical compounding is the process through which a pharmacist or physician combines, mixes, or alters ingredients to create a medicine that is tailored to the needs of the individual patient. Pharmaceutical compounding by physicians or pharmacists is a traditional medical practice that was common throughout the history of the United States.

17.     Pharmaceutical compounding remains a vital component of the healthcare industry. Pharmacists compound medicines for patients based on prescriptions from their physician. The compounded medicine is tailored to each patient's individual needs, as determined by their physician, and the ability to provide such customized prescriptions is an indispensable component of personalized medicine.

18.     Compounded medicines are medically necessary alternatives to commercially-manufactured drugs in many circumstances, such as for patients who are allergic to an inactive ingredient in a commercially-manufactured drug, who require a different dosage of a

commercially-manufactured drug (*e.g.*, infants), or who cannot take a drug in its commercially-manufactured form (*e.g.*, a patient who cannot swallow a pill). Compounding is extremely common for treating young children, feeding tube-dependent patients, patients with dysphagia, patients with certain allergies to dyes or inactive ingredients in other medicines, patients with dietary restrictions, patients with refractory neuropathic pain, oral lesions, or dyspepsia, patients that are unable to take in sufficient oral nutrition, and patients with cancer. *See* C. James Watson, *et al.*, *Pharmaceutical Compounding: A History, Regulatory Overview, and Systematic Review of Compounding Errors*, Journal of Medical Toxicology, at 198 (2021).

19.     Compounding is also critical when there is no commercially-manufactured version of the drug available, such as during a drug shortage or when a manufacturer discontinues production.

20.     Compounding traditionally was left to state regulation as a standard pharmaceutical practice that is within the scope of state licensure of pharmacists and pharmacies. The FDA does not have authority to regulate the practice of medicine.

21.     The FD&C Act was enacted in 1938 to regulate commercially-manufactured drugs. For approximately the first 50 years after passage of the FD&C Act, it was understood that the statute did not regulate pharmaceutical compounding, and pharmacists continued to compound medicines for patients without applying for FDA approval of those medicines under the FD&C Act. Indeed, requiring pharmacists to obtain FDA approval for compounded medicines would be prohibitively expensive, time-consuming, and as a practical matter impossible given that compounded medicines are tailored to meet the needs of each individual patient. Application of the FD&C Act to compounded medicines would therefore effectively prohibit them entirely, undermining patient access to important therapies.

**New FDA Position Mires Compounding Pharmacies in Uncertainty**

22.     In 1992, the FDA issued a "Compliance Policy Guide" announcing the FDA's new position that compounding pharmacies are subject to the FD&C Act but that it was FDA policy to permit pharmacists generally to compound drugs (as they had been for fifty years) as a matter of

its enforcement discretion. The Guide stated, however, that the "FDA may, in the exercise of its enforcement discretion, initiate federal enforcement actions … when the scope and nature of a pharmacy's activities raises the kinds of concerns normally associated with a manufacturer and ... results in significant violations of the new drug, adulteration, or misbranding provisions of the Act." *See* FDA, Compliance Policy Guide No. 7132.16, *Manufacture, Distribution, and Promotion of Adulterated, Misbranded, or Unapproved New Drugs for Human Use by State Licensed Pharmacies* (March 1992).

23.    The FDA's stunning pronouncement that all compounding was subject to the FD&C Act—and that the FDA only permits certain compounding as an exercise of its "enforcement discretion"—mired the legal status of compounding under the FD&C Act in uncertainty for the next three decades. *See* Jennifer Staman, *FDA's Authority to Regulate Drug Compounding: A Legal Analysis*, Cong. Research Serv. (Oct. 17, 2012) ("Staman").

24.    In 1997, in its first effort to provide clarity as to the legal status of compounding, Congress enacted the Food and Drug Administration Modernization Act of 1997, Pub. L. No. 105-115, which added Section 503A (21 U.S.C. § 353a) to the FD&C Act. Section 503A exempts compounded medicines from the FD&C Act's approval, adulteration, and misbranding provisions so long as they satisfy certain requirements, including that "the drug product is compounded for an identified individual patient based on the receipt of a valid prescription." 21 U.S.C. § 353a(a).

25.    One of the requirements in Section 503A is that, if the medicine is compounded with "bulk drug substances" that do not "comply with the standards of an applicable United States Pharmacopoeia or National Formulary monograph" and are not components of other approved drugs, then the drug substance should "appear on a list developed by the Secretary through regulations issued by the Secretary." *Id.* at § 353a(b)(1)(A)(III).

26.    Congress specifically directed that "[t]he Secretary … shall promulgate regulations identifying drug substances that may be used in compounding under subsection (b)(1)(A)(i)(III) for which a monograph does not exist or which are not components of drug products approved by the Secretary." 21 U.S.C. § 353a(d)(2) (1998) (now 21 U.S.C. § 353a(c)(2)). Congress further

directed that "[t]he Secretary shall include in the regulation the criteria for such substances, which shall include historical use, reports in peer reviewed medical literature, or other criteria the Secretary may identify." *Id.* This statutorily required list is referred to as the "Section 503A Bulks List."

27.    The House Conference Report stated that the purpose of Section 503A was to "ensure continued availability of compounded drug products as a component of individualized therapy, while limiting the scope of compounding so as to prevent manufacturing under the guise of compounding." H.R. Conf. Rep. 105-399, at 94 (1997). "The conferees also expect that the Secretary will develop the list of bulk drug substances described in subsection (b)(1)(A)(i)(III) within one year from the date of enactment." *Id.* at 95.

28.    The FDA published a notice of proposed rulemaking in 1999 that would have included twenty drug substances on an initial Section 503A Bulks List, noting that ten additional nominated drug substances were still under review. 64 Fed. Reg. 996 (1999). The FDA never finalized this rulemaking.

29.    In 2002, the Supreme Court invalidated a provision of Section 503A that prohibited providers from advertising or promoting compounded drugs as unconstitutional under the First Amendment. *See Thompson v. Western States Med. Ctr.*, 535 U.S. 357 (2002). The FDA "suspended" its efforts to develop the Section 503A Bulks list in light of this decision, even though the decision only invalidated Section 503A's speech restriction and at least one federal court of appeals had held that the restriction was severable from the remainder of the section. *See* Staman at 7. The FDA instead issued a new "Compliance Policy Guide" stating that, exercising its "enforcement discretion," it would not pursue "less significant violations" of the FD&C Act by compounders, but set out a non-exhaustive list of "nine acts it would consider pursuing." *Id.* at 5–6 (citing FDA Compliance Policy Guides Manual § 460.200 (May 2002)).

30.    In 2013, again in an effort to provide clarity as to the legal status of compounding, Congress passed the Compounding Quality Act as part of the Drug Quality and Security Act, Pub. L. No. 113-54 (2013), which removed the speech restriction in Section 503A that was invalidated

in *Western States*, but otherwise left the remainder of the section intact—including the FDA's duty to create the Section 503A Bulks List. The Compounding Quality Act made clear that "[i]n promulgating any regulations to implement this title" the FDA shall "issue a notice of proposed rulemaking that includes the proposed regulation," "provide a period of not less than 60 calendar days for comments on the proposed regulation," and "publish the final regulation not more than 18 months following publication of the proposed rule." *Id.* § 104.

### The FDA's Repeated Failure to Create a Section 503A Bulks List

31.    As noted above, the FDA failed to create a Section 503A Bulks List after Section 503A was enacted in 1997, including in the four and a half years prior to the Supreme Court's decision in *Western States* and the FDA's "suspension" of its efforts to create a Section 503A Bulks List.

32.    The FDA has likewise failed to finalize a Section 503A Bulks List after passage of the Compounding Quality Act in 2013.

33.    In 2013, the FDA published a notice in the Federal Register withdrawing the 1999 proposed rule and inviting nominations for bulk drug substances to be included on the Section 503A Bulks List. 78 Fed. Reg. 72841 (Dec. 4, 2013).

34.    After receiving over 2,000 nominations—many of which were for substances with an applicable monograph or were components of FDA-approved drugs and therefore did not need to be on the Section 503A Bulks List—the FDA reopened the nominations process in 2014 and provided more detailed instructions on the information that should be included in the nominations. 79 Fed. Reg. 37747 (July 2, 2014).

35.    As of July 2016, the FDA had received 69 nominations for unique drug substances that were eligible for inclusion of the list (*e.g.*, they had no applicable monograph and were not a component of an FDA-approved drug) and were nominated with "sufficient supporting evidence for FDA to evaluate them." *See* FDA, Draft Guidance, *Interim Policy on Compounding Using Bulk Drug Substances Under Section 503A of the Federal Food, Drug, and Cosmetic Act*, Revision 2

6–7 (Dec. 2023) ("2023 Draft Guidance"). Since 2016, the FDA also has received nominations for additional drugs substances for inclusion on the Section 503A Bulks List.

36.    In December 2016, the FDA published a proposed rule stating that it intends to evaluate nominated drug substances for inclusion on the Section 503A Bulks List on a "rolling basis" and publish notices of proposed rulemakings on such substances "as evaluations are completed." 81 Fed. Reg. 91071, 91076 (Dec. 16, 2016). The FDA stated that the criteria it would use to evaluate substances would be "(1) The physical and chemical characterization of the substance; (2) Any safety issues raised by the use of the substance in compounded drug products; (3) The available evidence of the effectiveness or lack of effectiveness of a drug product compounded with the substance, if any such evidence exists; and (4) Historical use of the substance in compounded drug products, including information about the medical condition(s) the substance has been used to treat and any references in peer-reviewed medical literature." *Id.* at 91082. In that proposed rulemaking, the FDA also proposed to include six drug substances and to not include four other substances on the Section 503A Bulks List. *Id.* at 91076–79.

37.    The FDA did not finalize the December 2016 proposed rulemaking until February 2019. *See* 84 Fed. Reg. 4696 (Feb. 19, 2019) (adopting 21 C.F.R. § 216.23).

38.    In September 2019, as part of the FDA's review of the nominated substances on a "rolling basis," the FDA published a notice of proposed rulemaking that would include five additional substances and would not include twenty-six other substances on the Section 503A Bulks List. 84 Fed. Reg. 46688 (Sept. 5, 2019). The FDA has not finalized this proposed rulemaking.

39.    The FDA has taken no action—not even publishing a notice of proposed rulemaking—with respect to determining whether the remaining nominated drug substances should be included on the Section 503A Bulks List. This includes taking no action on at least twenty-eight drug substances that were nominated as of July 2016.

40.    Nearly three decades after Section 503A was enacted—and a decade after Congress amended the section in the Compounding Quality Act—the FDA is still "working" to finalize the

Section 503A Bulks List. *See* FDA, *Bulk Drug Substances Used in Compounding* (last updated Dec. 21, 2022) ("FDA is working to develop the 503A bulks list and 503B bulks list. These lists will be updated on an ongoing basis as the agency evaluates bulk drug substances nominated for these lists.").[2]

### The FDA Governs Pharmaceutical Compounding by Bureaucratic Diktat, Contrary to Congress's Directive

41.    Instead of undertaking notice-and-comment rulemaking to create the statutorily-mandated Section 503A Bulks List, the FDA has been governing pharmaceutical compounding by issuing "interim" policies announcing the circumstances under which, exercising its enforcement discretion, it does not intend to take action against a pharmacist or physician for compounding.

42.    In July 2014, the FDA issued guidance stating that "[u]ntil a bulk drug substances list is published in the Federal Register as a final rule, human drug products should be compounded using only bulk drug substances that are components of drugs approved under section 505 of the FD&C Act, or are the subject of USP or NF monographs." FDA, *Pharmacy Compounding of Human Drug Products Under Section 503A of the Federal Food, Drug, and Cosmetic Act*, at 5 (July 2014).

43.    The July 2014 guidance provoked immediate backlash, as commentors informed the FDA that its policy would "cause[] unnecessary and inappropriate disruptions in patient care because there are patients receiving drugs compounded with bulk drug substances that are not components of FDA-approved drugs, or the subject of an applicable USP or NF monograph, but that may ultimately be included on the 503A bulks list, and those patients' care should not be disrupted while the list is under development." 2023 Draft Guidance at 4.

44.    In June 2016, the FDA announced an "interim" policy to "avoid unnecessary disruption to patient treatment while the Agency considers Bulk Drug Substances that were nominated with sufficient support to permit FDA to evaluate them and promulgates regulations required under Section 503A." FDA, *Guidance for Industry: Interim Policy on Compounding*

---

[2]    *Available    at*    https://www.fda.gov/drugs/human-drug-compounding/bulk-drug-substances-used-compounding.

*Using Bulk Drug Substances Under Section 503A of the Federal Food, Drug, and Cosmetic Act*, at 3 (June 2016).

45.     Pursuant to that "interim" policy the FDA announced that it would assign drug substances nominated for inclusion on the Section 503A Bulks List to three categories as follows.

        a.      Category 1 constitutes drug substances that "may be eligible for inclusion on the 503A bulks list, were nominated with sufficient supporting information for FDA to evaluate them, and do not appear to present a significant safety risk." *Id.* at 7–11. The FDA announced that it "does not intend to take action for compounding a drug product from a bulk drug substance in Category 1" provided it satisfies the other requirements of the section. *Id.*

        b.      Category 2 constitutes drug substances that "have been identified by FDA as presenting a significant safety risk." *Id.* The FDA stated that Category 2 "bulk drug substance[s] cannot be used in compounding under Section 503A of the FD&C Act. A drug compounded using the bulk drug substance is subject to regulatory action." *Id.*

        c.      Category 3 constitutes substances that "may be eligible for inclusion on the 503A bulks list, but w[ere] nominated with insufficient supporting information for FDA to evaluate [them]." *Id.* The FDA stated that Category 3 "bulk drug substance[s] cannot be used in compounding under Section 503A of the FD&C Act." *Id.*

46.     The FDA revised this "interim" policy in January 2017, although the categorization remained the same. *See* FDA, *Interim Policy on Compounding Using Bulk Drug Substances Under Section 503A of the Federal Food, Drug, and Cosmetic Act*, Revision 1 (Jan. 2017).

47.     In December 2023, the FDA issued draft guidance that, if adopted, would end the categorization policy for substances nominated for inclusion on the Section 503A Bulks List after the draft guidance is finalized. *See* 2023 Draft Guidance at 13. The policy would remain applicable for substances nominated with sufficient supporting information before such date. In other words, if the draft guidance were finalized today, a substance that is nominated to the Section 503A Bulk List tomorrow would not be eligible for the categorization policy and could not be compounded until the FDA makes a final decision about its inclusion on the Section 503A Bulks List, but the

categorization policy would continue to apply to substances that were already nominated with sufficient supporting information.

48.    In all practical respects, the FDA's "interim" categorization policy has the force and effect of law. Specifically, as relevant here, the FDA and industry treat substances that are assigned to Category 2 as illegal to compound.

49.    The FDA's "interim" policy has been in place for nearly a decade and there is no foreseeable end to the policy in sight with respect to substances that the FDA has assigned to its "interim" categories.

50.    Unlike the statutorily-mandated process for developing the Section 503A Bulks List, the FDA's "interim" policy assigns drug substances to categories without any notice or opportunity to comment and without reasoned rulemaking by the agency.

51.    The FDA adds and removes drug substances from the three categories "to reflect any new nominations or other changes on a periodic basis." FDA, *Bulk Drug Substances Used in Compounding Under Section 503A of the FD&C Act* (last updated Dec. 12, 2023).[3]

### The FDA Prohibits Compounding Pharmacies from Providing Patients with Four Critical Therapeutics

52.    On September 29, 2023, with no notice or opportunity for comment, the FDA assigned nineteen drug substances to Category 2 of its "interim" policy, thereby effectively prohibiting their use in compounding.

53.    Prior to September 29, 2023, the FDA had assigned just four substances to Category 2, all of which followed public meetings on those four substances that were noticed in the Federal Register. *See* FDA, *Pharmacy Compounding Advisory Committee; Notice of Meeting*, 80 Fed. Reg. 59160, 59161 (Oct. 1, 2015) (discussing Germanium Sesquioxide and Domperidone); FDA, *Pharmacy Compounding Advisory Committee; Notice of Meeting*, 81 Fed. Reg. 35782, 35783 (June 3, 2016) (discussing Cesium Chloride); FDA, *Pharmacy Compounding Advisory*

---

[3]    *Available at* https://www.fda.gov/drugs/human-drug-compounding/bulk-drug-substances-used-compounding-under-section-503a-fdc-act.

*Committee; Notice of Meeting*, 81 Fed. Reg. 7351, 7352 (Feb. 11, 2016) (discussing Quinacrine Hydrochloride).

54.    Most of the substances added to Category 2 on September 29, 2023, were peptides, which are essentially smaller versions of proteins. (A protein generally is viewed as an amino-acid chain with 40 or more amino acids; a peptide is an amino-acid chain with less than 40 amino acids.) Like proteins, peptides are naturally present in foods; well-known peptides include collagen and creatine. For decades, practitioners have prescribed peptide-based therapies to individual patients and relied on compounding pharmacies to prepare those treatments on a patient-specific basis. Given the nuances of peptide treatment, many such therapies are available for use by practitioners only through pharmaceutical compounding.

55.    Four of the peptides assigned to Category 2 are AOD-9604, CJC-1295, ipamorelin acetate ("ipamorelin"), and Thymosin Alpha-1 ("Ta1"). *See* FDA, *Safety Risks Associated with Certain Bulk Drug Substances Nominated for Use in Compounding* (last updated Dec. 12, 2023).[4]

56.    AOD-9604 was nominated for inclusion on the Section 503A Bulks List on November 16, 2018.

a.    The nomination packet submitted to the FDA includes the following information about AOD-9604. AOD-9604 is a peptide fragment of a component of human growth hormone ("HGH"). It is an important alternative therapy to HGH, which has important medicinal uses but is associated with various health risks like diabetes, cancer, and hypertension. AOD-9604 is used to treat osteoarthritis, osteoporosis, and obesity. Multiple controlled clinical studies on humans have demonstrated that AOD-9604 is an effective, well-tolerated alternative to HGH that presents less of a long-term risk.

b.    The FDA's explanation for assigning AOD-9604 to Category 2 consists of three sentences: "Compounded drugs containing AOD-9604 may pose significant risk for immunogenicity for certain routes of administration and may have complexities with regard to

---

[4] *Available at* https://www.fda.gov/drugs/human-drug-compounding/safety-risks-associated-certain-bulk-drug-substances-nominated-use-compounding.

peptide-related impurities and API characterization. FDA has identified no, or only limited, safety-related information for proposed routes of administration; thus we lack sufficient information to know whether the drug would cause harm when administered to humans. FDA has also identified serious adverse events that may be associated with AOD-9604, though causality is not clear."

c.    The FDA's boilerplate, cursory reasoning is contradicted by the administrative record, as the nomination packet for AOD-9604 cited multiple clinical studies establishing that AOD-9604 is well-tolerated and safe for use in humans. These studies do not suggest that AOD-9604 is associated with any serious adverse effects. The FDA also did not address the fact that AOD-9604 is an important alternative therapy to HGH, which has a greater risk of adverse effects.

d.    The FDA's statement regarding a risk of "immunogenicity" (*i.e.*, provoking an unwanted immune response through the body's creation of antibodies to the therapy) also is flatly contradicted by studies in the administrative record: "Finally, the hexadecapeptide AOD9604 did not induce allergenic reactions when consumed over 24 weeks. Blood of patients was analyzed for the presence of anti-AOD9604 antibody formation at various times and at the end of the studies (latest time point after 24 weeks). In none of the performed studies, at no time, were anti-AOD9604 antibodies detected in serum collected from any subjects in any treatment group." Stier, H. *et al.*, *Safety and Tolerability of the Hexadecapeptide AOD9604 in Humans*, Journal of Endocrinology & Metabolism, at 14 (2013).

57.    CJC-1295 was nominated for inclusion on the Section 503A Bulks List on November 16, 2018. CJC-1295 has been used in clinical practice, without noted adverse effects, for decades.

a.    The nomination packet submitted to the FDA contains the following information about CJC-1295. CJC-1295 is a synthetic analogue of growth hormone-releasing hormone ("GHRH"). CJC-1295 is an important alternative to GHRH, which has a short half-life that limits its effectiveness as a treatment and also is associated with several adverse effects. CJC-1295 is used to treat a variety of conditions, including Turner Syndrome, Prader-Willi syndrome,

HIV-associated lipodystrophy, wasting syndrome, children born small for their gestational age or with idiopathic short stature, and severe burns.

      b.     The FDA's explanation for assigning CJC-1295 to Category 2 consists of three sentences: "Compounded drugs containing CJC-1295 may pose risk for immunogenicity for certain routes of administration and may have complexities with regard to for [sic] peptide-related impurities and API characterization. FDA has identified serious adverse events associated with CJC-1295 including increased heart rate and systemic vasodilatory reaction. Available clinical data are limited."

      c.     The FDA's boilerplate, cursory reasoning is contradicted by the administrative record, as the nomination packet for CJC-1295 cited multiple clinical studies establishing that CJC-1295 is well-tolerated and safe for use in humans. These studies do not suggest that CJC-1295 is associated with any serious adverse effects. The FDA also did not address the fact that CJC-1295 is an important alternative therapy to GHRH, which has a greater risk of adverse effects.

      d.     The FDA's statement that CJC-1295 might be associated with serious adverse events also is flatly contradicted by studies in the administrative record: "No serious adverse reactions [to CJC-1295] were reported in either study." Teichman, S. *et al.*, *Prolonged Stimulation of Growth Hormone (GH) and Insulin-Like Growth Factor I Secretion by CJC-1295, a Long-Acting Analog of GH-Releasing Hormone, in Healthy Adults*, Journal of Clinical Endocrinology & Metabolism, at 804 (2005); Ionescu, M. & Frohman, L., *Pulsatile Secretion of Growth Hormone (GH) Persists during Continuous Stimulation by CJC-1295, a Long-Acting GH-Releasing Hormone Analog*, Journal of Clinical Endocrinology & Metabolism, at 4795 (2006) ("No serious adverse effects were observed in any of the subjects."). And with respect to immunogenicity, "[n]o significant antibody formation was detected in subjects who received the active study drug." Teichman at 803.

    58.     Ipamorelin was nominated for inclusion on the Section 503A Bulks List on November 16, 2018.

a.      The nomination packet submitted to the FDA includes the following information about ipamorelin. Ipamorelin is a ghrelin-receptor agonist that is used to treat postoperative ileus or delay of gastrointestinal function following abdominal surgery—conditions which have no effective FDA-approved treatment.

b.      The FDA's explanation for assigning ipamorelin to Category 2 consists of four sentences: "Compounded drugs containing Ipamorelin acetate may pose risk for immunogenicity for certain routes of administration due to the potential for aggregation or peptide-related impurities. Ipamorelin acetate also contains unnatural amino acids, which add to the complexity of peptide characterization. A study published in literature identified serious adverse events including death when ipamorelin was administered intravenously for improving gastric motility. We have not identified safety-related information regarding ipamorelin acetate via certain other injectable routes of administration; thus, we lack sufficient information to know whether the drug would cause harm if administered to humans via those routes."

c.      The FDA's boilerplate, cursory reasoning is contradicted by the administrative record, as the nomination packet established that ipamorelin is well-tolerated and safe for use in humans. There is nothing in the submitted studies suggesting that ipamorelin poses a risk for immunogenicity. And while two patients who received ipamorelin in one study passed away, the study makes clear that both deaths were related to postoperative complications. Beck, D. *et al.*, *Prospective, randomized, controlled, proof-of-concept study of the Ghrelin mimetic ipamorelin for the management of postoperative ileus in bowel resection patients*, International Journal of Colorectal Disease, at 1529 (2014). The study concluded that "[i]n general, ipamorelin was well tolerated" and the "incidence of [treatment-emergent adverse effects] was nominally lower for ipamorelin than placebo." *Id.* at 1532.

d.      The FDA's concern about other routes of administration not only is misplaced, but inconsistent with how the FDA has treated other nominated bulk drug substances. For example, the same day that the FDA assigned ipamorelin to Category 2, the FDA assigned GHK-Cu generally to Category 1 but assigned GHK-CU for injectable routes of administration to

16

Category 2. There is no rational reason the FDA also could not distinguish between permissible and impermissible routes of administration for ipamorelin, even if the record supported assigning certain routes of administration to Category 2.

59.    Ta1 was nominated for inclusion on the Section 503A Bulks List on February 9, 2021.

a.    The nomination packet submitted to the FDA includes the following information about Ta1. Ta1 is a peptide that activates various cells of the immune system and is used to treat a variety of disorders involving impaired immune responses, including sepsis, infections after bone marrow transplant, Chronic Obstructive Pulmonary Disorder, hepatitis, HIV, and certain cancers, as well as vaccine non-responsiveness.

b.    The FDA's explanation for assigning Ta1 to Category 2 consists of two sentences: "Compounded drugs containing thymosin-alpha-1 (Ta1) may pose significant risk for immunogenicity for certain routes of administration and may have complexities with regard to peptide-related impurities and API characterization. The safety-related information in the nomination is inadequate for FDA to sufficiently understand the extent of any safety issues raised by the proposed compounded product."

c.    The FDA's boilerplate, cursory reasoning is contradicted by the administrative record, as the nomination packet established that Ta1 is well-tolerated and safe for use in humans. Indeed, "[s]ince its discovery in 1979, Ta1 has been evaluated in over 80 clinical studies and administered to more than 230,000 patients in postmarketing experience…. Ta1 has been well tolerated and has not been associated with any significant side effects." Tuthill, C.W., *et al.*, *Thymosin [Alpha] 1 – A Peptide Immune Modulator with a Broad Range of Clinical Applications*, Journal of Clinical & Experimental Pharmacology, at 11 (2013). The studies also do not support the FDA's assertion that Ta1 poses a risk of immunogenicity. To the contrary, Ta1 is used to enhance patients' otherwise-deficient immune responses.

*The FDA's Actions Prevent Plaintiffs from Providing Patients with Those Critical Therapeutics*

60. Plaintiff EVEXIAS Medical Centers is a medical practice that has over 700 patients that were prescribed peptide-based therapies, including AOD-9604, CJC-1295, ipamorelin, and Ta1, prior to the FDA's assignment of the substances to Category 2. The FDA's assignment of these substances to Category 2 prevents physicians of EVEXIAS Medical Centers from providing their patients with the most effective and safest therapies for their individual circumstances.

61. Plaintiff EVEXIAS Health Solutions is a medical training and consulting company. Through its specialized physicians, pharmacists, and other highly educated health professionals, EVEXIAS Health Solutions instructs other licensed medical practitioners about the significant benefits that AOD-9604, CJC-1295, ipamorelin, Ta1, and other compounded therapies can provide to patients, especially patients with conditions that are not responding to standard medical treatment. The FDA's assignment of these substances to Category 2 has caused significant, immediate damage to the curriculum and positive approach taught by EVEXIAS Health Solutions that has benefitted hundreds of thousands of patients.

62. Plaintiff FarmaKeio is a pharmacy that compounded peptide-based therapies, including AOD-9604, CJC-1295, ipamorelin, and Ta1, prior to the FDA's assignment of the substances to Category 2. The FDA's assignment of these substances to Category 2 prevents FarmaKeio from compounding these substances.

63. But for the FDA's assignment of these substances to Category 2, EVEXIAS Medical Centers would continue treating patients with these peptide-based therapies; EVEXIAS Health Solutions would continue its work to advance these therapies; and FarmaKeio would continue compounding these therapies. As a practical matter, the FDA and the compounding industry treats substances assigned to Category 2 as "banned" substances, whereas it is permissible to compound with other substances pending the FDA's finalization of the Section 503A Bulks List.

**FIRST CAUSE OF ACTION**
**(Arbitrary and Capricious Agency Action in Violation of APA)**

64.    The above paragraphs are hereby incorporated by reference as if set forth fully herein.

65.    On September 29, 2023, the FDA added AOD 9604, CJC-1295, ipamorelin, and Ta1 to Category 2 of its Interim Policy on Compounding Using Bulk Drug Substances Under Section 503A of the Federal Food, Drug, and Cosmetic Act.

66.    The FDA's addition of AOD 9604, CJC-1295, ipamorelin, and Ta1 to Category 2 constitutes final agency action for purposes of the APA.

67.    As a practical matter, the FDA treats its interim categorization as having the force and effect of law, and its "interim" policy has been in place for nearly a decade.

68.    The FDA's addition of AOD-9604, CJC-1295, ipamorelin, and Ta1 to Category 2 is arbitrary and capricious.

69.    Plaintiffs are harmed by the FDA's addition of AOD-9604, CJC-1295, ipamorelin, and Ta1 to Category 2.

70.    Consequently, the FDA's addition of AOD-9604, CJC-1295, ipamorelin, and Ta1 to Category 2 violates the APA, entitling plaintiffs to the relief requested below.

**SECOND CAUSE OF ACTION**
**(Invalid Rulemaking Without Notice and Comment)**

71.    The above paragraphs are hereby incorporated by reference as if set forth fully herein.

72.    The FDA's "interim" categorization of a drug substance is a substantive rule for purposes of the APA.

73.    The FDA's "interim" categorization of a drug substance is subject to notice and comment pursuant to the APA.

74.    As a practical matter, the FDA treats its "interim" categorization as having the force and effect of law, and its "interim" policy has been in place for nearly a decade.

75.    The FDA's "interim" categorization of drug substances, including its categorization of AOD-9604, CJC-1295, ipamorelin, and Ta1 to Category 2, was invalidly promulgated without notice and comment.

76.    The FDA's "interim" categorization of drug substances, including its designation of AOD-9604, CJC-1295, ipamorelin, and Ta1 to Category 2, without notice and comment harms plaintiffs.

77.    Consequently, the FDA's "interim" categorization of drug substances, including its designation of AOD-9604, CJC-1295, ipamorelin, and Ta1 to Category 2, violates the APA, entitling plaintiffs to the relief requested below.

### THIRD CAUSE OF ACTION
**(Agency Action Unlawfully Withheld or Unreasonably Delayed in Violation of APA)**

78.    The above paragraphs are hereby incorporated by reference as if set forth fully herein.

79.    The FDA has unlawfully withheld or unreasonably delayed issuing the Section 503A Bulks List, including delay in determining whether AOD-9604, CJC-1295, ipamorelin, and Ta1 should be included on the list.

80.    As enacted in 1997, Section 503A has provided that the FDA "shall promulgate regulations identifying drug substances that may be used in compounding under subsection (b)(1)(A)(i)(III) for which a monograph does not exist or which are not components of drug products approved by the Secretary" ("Section 503A Bulks List"). *See* 21 U.S.C. § 353a(c)(2).

81.    The FDA has stated that it is processing nominations for inclusion on the Section 503A Bulks List on a "rolling basis."

82.    By June 2016, the FDA had received nominations for inclusion on the Section 503A Bulks List for 69 unique drug substances that were nominated with "sufficient supporting evidence for FDA to evaluate them." 2023 Draft Guidance, at 6–7. To date, the FDA has only issued determinations with respect to whether *ten* of those substances will be included on the Section 503A Bulks List. In 2019, the FDA issued a notice of proposed rulemaking that would include five

additional substances on the list and reject the inclusion of 26 other substance; the FDA has never finalized this rulemaking.

83.    On November 16, 2018, the FDA received nominations for AOD-9604, CJC-1295, and ipamorelin for inclusion on the Section 503A Bulks List. On February 9, 2021, the FDA received a nomination for Ta1 for inclusion on the Section 503A Bulks List. To date, the FDA has issued no determination—not even a notice of proposed rulemaking—regarding whether these substances will be included on the Section 503A Bulks List.

84.    The FDA's failure to issue a final Section 503A Bulks List harms plaintiffs.

85.    Consequently, the FDA has unreasonably delayed in finalizing the Section 503A Bulks List and the Court should compel the FDA to finalize the list, including determining whether AOD-9604, CJC-1295, ipamorelin, and Ta1 should be included on the list.

### Prayer for Relief

Plaintiffs respectfully asks that this Court enter judgment in their favor and that they be granted the following relief:

A.    Declare that the FDA's designation AOD-9604, CJC-1295, ipamorelin, and Ta1 to Category 2 is arbitrary and capricious in violation of the APA;

B.    Declare that the FDA's "interim" categorization of drug substances without notice and comment violates the APA;

C.    Declare that the FDA has unreasonably delayed finalizing the Section 503A Bulks List, including in determining whether AOD-9604, CJC-1295, ipamorelin, and Ta1 should be included on the list;

D.    Vacate the FDA's designation AOD-9604, CJC-1295, ipamorelin, and Ta1 to Category 2;

E.    Vacate the FDA's "interim" categorization of drug substances without notice and comment;

F.    Enjoin the FDA from taking enforcement action against plaintiffs based on its "interim" categorization;

G.    Compel the FDA to finalize the Section 503A Bulks List, including determining whether AOD-9604, CJC-1295, ipamorelin, and Ta1 should be included on the list;

H.    Award plaintiffs their fees and costs related to this action, including reasonable attorneys' fees; and

I.    Grant such other and further relief as the Court deems appropriate.


Dated: March 29, 2024                    Respectfully submitted,


                                         /s/ *Ty Doyle*
                                         TY DOYLE
                                         BAKER & HOSTETLER LLP
                                         811 Main Street, Suite 1100
                                         Houston, TX 77002
                                         Texas Bar No. 24072075
                                         (713) 646-1374
                                         tgdoyle@bakerlaw.com

                                         LEE H. ROSEBUSH*
                                         ANDREW M. GROSSMAN*
                                         KRISTIN A. SHAPIRO*
                                         MARC N. WAGNER*
                                         BAKER & HOSTETLER LLP
                                         1050 Connecticut Ave., N.W., Suite 1100
                                         Washington, D.C. 20036
                                         (202) 861-1567
                                         lrosebush@bakerlaw.com

                                         *  Motion for pro vac vice admission
                                            forthcoming

                                         *Attorneys for EVEXIAS Medical Centers, PLLC, EVEXIAS Health Solutions, LLC, and North American Custom Laboratories, LLC, d/b/a FarmaKeio Custom Compounding*